**Jane M. COLLIGNON, f/k/a Jane M. Dixon, and Christine Dooley, Plaintiffs,**

v.

**REPORTING SERVICES CO., an Iowa Corporation, Joseph P. Kelly III and Donna M. Kelly, Defendants.**

No. 91–4006.

United States District Court, C.D. Illinois, Rock Island Division.

April 27, 1992.

James S. Zmuda, Califf & Harper, Moline, Ill., for plaintiffs.

Alan G. Blackwood, Blackwood Nowinski & Swanson, Moline, Ill., for defendants.

## ORDER

McDADE, District Judge.

Before the Court is Plaintiffs' Motion for Summary Judgment (Doc. No. 11, Part 1). For the foregoing reasons, Plaintiffs' Motion is granted in part and denied in part.

## BACKGROUND

Plaintiffs bring this lawsuit pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B). Plaintiffs are participants in the Reporting Services Co. Profit Sharing Plan. *Id.* Defendant Reporting Services Co. (Reporting Services) is both the Plan Administrator and Plan Sponsor of the Profit Sharing Plan. (Complt. No. 3, Ans. No. 3). Defendants Joseph Kelly and Donna Kelly are the Trustees (Plan Fiduciaries) of the Plan. (Complt. No. 4, Ans. No. 4). Plaintiff Collignon became a participant in the Plan on or about May 31, 1985. Since then until on or about April 28, 1989, she has had no breaks in service and became and continued to be a vested participant in the Plan. (Complt. No. 6, Ans. No. 6). Plaintiff Dooley became a participant in the Plan on or about November 30, 1984, and to on or about April 28, 1989, she had no breaks in service and became and continued to be a vested participant in the Plan. (Complt. No. 7, Ans. No. 7).

On or about April 28, 1989, certain assets of Reporting Services were purchased by Dixon Reporting Services, Inc. (Dixon), incorporated by Plaintiff Collignon and her then husband. (Complt. No. 8, Ans. No. 8). Dixon did not purchase the Plan or any of its assets, and therefore, there was no reason for it to continue the Plan.

Plaintiffs have now moved for summary judgment, contending that the sale of the assets by the Defendant Reporting Services and the subsequent departure of the majority of the employees of the business constituted either a complete or partial termination of the Profit Sharing Plan maintained by Reporting Services, such that Plaintiffs are fully vested of their account balances and are entitled to receive payment of them.

Specifically, Plaintiffs contend that the sale was one of all or substantially all of the assets of Reporting Services business, particularly since all but one of Reporting Services' employees left the company to work for the Buyer. Plaintiffs contend that this constitutes a complete termination of the Plan under its terms. Plaintiffs alternatively contend that even if a complete termination of the Plan has not occurred, because there was a significant reduction in the number of employees who are participants in the Plan as a result of the sale of assets, a partial plan termination occurred. Plaintiffs further contend that Section VIII of the Plan, which gives the Plan Administrator the discretion to choose the method by which vested account balances will be paid, violates the Internal Revenue Code. Therefore, Plaintiffs are entitled to a lump sum payment of their account balances due immediately.

Defendants do not dispute that when a complete or partial plan termination occurs, plan participant accounts become non-forfeitable. However, Defendants dispute that a complete or partial termination occurred in this case. Defendants contend that a complete termination did not occur pursuant to the terms of Section 11.2 because the sale did not include certain vehicles, CD's, and bank accounts listed in the name of the business, and thus, did not constitute a sale of all or substantially all of the assets of Reporting Services Co. Defendants further contend that a partial termination of the plan did not occur because voluntary employee decisions to leave the employer do not constitute partial plan terminations. Defendants contend that the evidence indicates that the employee departures from Reporting Services were voluntary or, alternatively, that there is insufficient evidence to determine whether the departures were voluntary or involuntary, which precludes the granting of summary judgment in favor of Plaintiff.

## APPLICATION OF LAW

### I. A COMPLETE TERMINATION DID NOT OCCUR UNDER THE TERMS OF THE PLAN.

Internal Revenue Code § 411(d) provides: [A] Trust shall not constitute a qualified trust under § 401(a) unless the plan of which such trust is a part provides that—(A) upon its termination or partial termination ... the rights of all effected employees to benefits accrued to the date of such termination, partial termination or discontinuance, to the extent funded

as of such date, or the amounts credited to the employees' accounts are non-forfeitable. 26 U.S.C. § 411(d)(3).

■ The parties agree that under this provision, when a partial or complete plan termination occurs, plan participant accounts become non-forfeitable. The parties agree that whether or not the Plan was completely terminated is governed·by the terms of the Plan. Section 11.2 of the Plan provides that "the Plan will terminate on the first to occur of the following: ... (d) the dissolution, merger, consolidation, or reorganization of the Employer, or the sale by the Employer of all or substantially all of its assets...." The April 28, 1989, sale of assets was not a sale by Reporting Services of "all or substantially all of its assets" and thus, did not cause a complete termination of the plan.

The terms of the "Asset Purchase Agreement" entered into between Reporting Services and Dixon Reporting provides under Article I, entitled "Assets To Be Purchased" that:

> Subject to the terms and conditions set forth in this Agreement, the Seller agrees to sell to the Buyer and the Buyer agrees to purchase from the Seller at the Closing (as hereinafter defined) all of the assets of the Seller owned or used in connection with the operation of the subject business as the same may exist on the date of the Closing, including, without limitation, the following...."

The "following" includes all of the furniture, fixtures, and equipment, including video equipment, all right title and interest in the name "Reporting Services" and the business' telephone number, all general business records relating to the clients and customers of the Seller, but excluding corporate financial records, such as general ledgers and income tax returns and the like, and the Goodwill, if any, of the business. In addition, Dixon Reporting agreed to lease the premises previously occupied by Reporting Services. Dixon also agreed to assume and perform certain of the liabilities and obligations of Reporting Services.

After the closing, Reporting Services executed a further assignment in favor of Dixon pertaining to all of the subject assets not previously transferred to Dixon, which was intended to cover, among other things, certain written employment agreements between Reporting Services and its employees. All of the employees of Reporting Services except for Defendant Donna Kelly became employees of Dixon.

However, despite the language of the asset purchase agreement, certain valuable assets of Reporting Services were not included in the sale. Prior to the sale, Reporting Services had total assets of $264,-129. After the sale, Reporting Services (n/k/a Kelly Reporting Services) had assets of $253,144. The assets not sold consisted of cash in a Shearson–Lehman Cash Management Account and a government security fund, improvements to the office building used by the business, and automobiles used in the business. After the sale, Reporting Services changed its name to Kelly Reporting Services Company,[1] and Donna Kelly continued to do reporting work in Iowa and in Illinois, the latter work being done pursuant to an independent contractor agreement with Dixon.[2] According to Defendants, the automobiles retained after the sale are currently used in the furtherance of the business of Kelly Reporting Services Company. Because only a small percentage of the assets of Reporting Services was sold in terms of dollar value, the Court cannot conclude that the April ·28, 1989, sale was one of "all or substantially all" of the assets of Reporting Services.

Plaintiffs seek to avoid the fact that certain assets of significant value were not included in the sale by claiming that the sale should nonetheless be treated as one involving "substantially all" of the assets of Reporting Services because virtually all of the operating assets of the business were sold and all but one of the employees were transferred to Dixon. Plaintiffs rely on *Moffatt v. Commissioner*, 363 F.2d 262

---

1. The corporate employer Reporting Services did not dissolve but merely changed its name.

2. Donna Kelly entered into a covenant not to compete with Dixon in certain areas of Illinois.

(9th Cir.1966), *cert. denied*, 386 U.S. 1016, 87 S.Ct. 1370, 18 L.Ed.2d 453 (1967), in which the court determined whether a sale of assets was one of "substantially all of the assets" under 26 U.S.C. § 368(a)(1)(D).[3]

In *Moffatt*, the court determined whether certain distributions by an engineering corporation, Moffatt & Nichol, Inc., to its shareholders (petitioners) were liquidating distributions under Sections 331(a)(2) and 346 of the Internal Revenue Code, and therefore taxable as capital gains, or whether the distributions were incident to a plan of reorganization under Sections 356 and 368 of the Code and therefore taxable at ordinary income rates. At issue was whether the sale of assets to a new corporate entity with the same stockholders was one of substantially all of the assets of the company. Seventy-five percent of the assets of the company were sold, and all of the skilled employees, deemed by the court to be the most essential asset of the service-oriented engineering company, were transferred to the new company. All that remained in the old corporation immediately after the transfer were certain nondelegable contracts, cash and accounts receivable, and land that had never been used by the business.

The *Moffatt* court relied on the language of Revenue Ruling 57–518, 1957–2 C.B. 253, to the effect that no specific percentage of assets should be controlling in determining whether "substantially all of the properties" of a corporation have been sold under Section 368(a)(1)(C) of the Internal Revenue Code.[4] Rather, "the nature of the properties retained by the transferor, the purpose of retention, and the amount thereof" are all to be considered. *Moffatt*, 363 F.2d at 267. The court observed that:

> [I]n one form or another the new company had the use and benefit of all the assets relating to the operation of the

business, whether by "loans", "rentals" of equipment followed ultimately by sale thereof, or otherwise. And it finally wound up with all the assets that were necessary or appropriate to the conduct of the business. There remained in the hands of the shareholders only certain nonoperating assets that were not required in the business, and even these assets [as resources] were "pledged" by Moffatt & Nichol to the new corporation. *Moffatt*, 363 F.2d at 267.

The Court does not believe that *Moffatt* compels the conclusion that the sale of assets at issue here constitutes a sale of substantially all of the assets of Reporting Services. First, *Moffatt* did not involve the interpretation of plan language in the context of a plan termination such is at issue here. Rather, *Moffatt* involved interpretation of the term "substantially all" of the assets as it was used in the Internal Revenue Code for the purpose of determining whether a business was "reorganized" or liquidated for the purposes of the rate of taxation of the related distributions. Courts have interpreted the term "substantially all" of the assets quite liberally in this context to prevent taxpayers from devising business transactions which technically fall within the Internal Revenue Code's provisions permitting capital gains treatment of certain distributions, when in fact, a continuing business enterprise is carried on in corporate form without substantial change in ownership. *Smothers v. United States*, 642 F.2d 894 (5th Cir.1981). This case implicates no such concerns. Further, *Moffatt* is distinguishable in that 75% of the total assets of the corporation were transferred, whereas here, 75% of the dollar value of the assets was retained. Although a close question, the Court cannot conclude that the April 28, 1989, sale of assets was one of "all of substantially all"

---

**3.** Title 26 U.S.C. § 368(a)(1)(D) defines the term "reorganization" as "a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer, the transferor, or one or more of its shareholders ... is in control of the corporation to which the assets are transferred." 26 U.S.C. § 368.

**4.** Section 368(a)(1)(C) defined the term "reorganization" as "[t]he acquisition by one corporation in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation) of substantially all of the properties of another corporation ..." 26 U.S.C. § 368(a)(1)(C).

of Reporting Services' assets such that termination occurred under the terms of Section 11.2 of the Plan.

## II. THE APRIL 1989 SALE OF ASSETS CONSTITUTED A PARTIAL PLAN TERMINATION

██ Even if a complete plan termination did not occur under the terms of the Plan, partial plan termination did occur. Under the Internal Revenue Commission regulations, in determining whether a partial termination has occurred, one must look to all the facts and circumstances of the case, including the exclusion, by reason of a plan amendment or severance by the employer, of a group of employees who have been previously covered by the plan.[5] 26 C.F.R. § 1.411(d)–2(b). The case law requires that there be a substantial reduction in plan participants attributable to "involuntary exclusions" or "employee terminations" before a partial plan termination can be said to have occurred. *Sage v. Automation, Inc. Pension Plan and Trust,* 845 F.2d 885, 891 (10th Cir.1988). An employer-initiated permanent reduction of a significant percentage of employees from a plan as part of a major corporate event may constitute a partial termination. *Id.; In re Gulf Pension Litigation,* 764 F.Supp. 1149 (S.D.Tex.1991). Voluntary employee decisions to leave the employer do not constitute partial plan terminations. *Kreis v. Charles O. Townley, M.D. & Assoc., P.C.,* 833 F.2d 74 (6th Cir.1987).

██ Revenue rulings and case law indicate that partial plan termination can occur when the employer forces the employee's exclusion from the plan. In Revenue Ruling 73–284, 1973–2 C.B. 139, the IRS concluded that partial termination of a qualified pension plan occurred when the employer's business was closed and 12 of the

15 participating employees were discharged upon refusing the opportunity to transfer to the employer's new business location 100 miles away. The IRS noted that although the employees were given the opportunity to move to the employer's new business location, the change in business location effectively excluded a significant percentage of the employees from participating in the plan. In *Morales v. Pan American Life Ins. Co.,* 718 F.Supp. 1297, 1303 (E.D.La.1989), *aff'd* 914 F.2d 83 (5th Cir. 1990), the court included among those employees involuntarily "terminated" as a result of a business closing, the employees who resigned prior to the closing, inferring that they did not "voluntarily" leave their jobs even if they found other employment before the closing.

██ Here a substantial reduction in plan participants occurred in connection with a major corporate event. All of the employees of Reporting Services, except for Donna Kelly, (83%) left the business in connection with the sale of Reporting Services' assets. All of the employees (83%), along with Donna Kelly, were plan participants.[6] Defendants contend that the Court cannot determine that a partial plan termination occurred because there is no evidence as to why the employees left Reporting Services after the sale and that the evidence indicates that the employees were not required to work for Dixon but could have done what they wanted. However, it is clear under the facts of this case that the employees did not have the option of remaining with Reporting Services and therefore, they were involuntarily excluded from the Plan.

Virtually all of the operating assets of Reporting Services were sold to Dixon as part of the sale of assets. As part of the sale, Donna Kelly entered into an independent contractor agreement setting forth

---

**5.** 26 C.F.R. § 1.411(d)–2 provides in relevant part:

> *Partial termination—*(1) *General rule.* Whether or not a partial termination of a qualified plan occurs (and the time of such event) shall be determined by the Commissioner with regard to all the facts and circumstances in a particular case. Such facts and circumstances include: the exclusion, by reason of a plan amendment or severance by the employer, of a group of employees who have been previously covered by the plan; and plan amendments which adversely affect the rights of employees to vest in benefits under the plan. 26 C.F.R. § 1.411(d)–2(b).

**6.** Since only Donna Kelly was fully vested, 100% of the employees that were not fully vested left Reporting Services.

the terms under which Donna Kelly could do business with Dixon, which contained a covenant not to compete. Under these circumstances, it is unlikely that Kelly Reporting could have retained all of the employees of Reporting Services. It was at least implicitly, if not expressly, agreed by the parties to the sale that Dixon would employ all of Reporting Services employees after the sale. All of the employees except for Donna Kelly were offered and accepted employment with Dixon after the sale. Reporting Services provided Dixon with it's employment contracts, and Dixon assumed the employment contracts of Reporting Services' employees after the sale. When one of the employees of Dixon, who had been an employee of Reporting Services, voluntarily terminated her employment with Dixon, Dixon attempted to enforce the covenant not to compete contained in the contract between the employee and Reporting Services, which had been provided to it by Donna Kelly. At no time prior to or after the sale did Donna Kelly or Reporting Services/Kelly Reporting Services offer any of Reporting Services' employees, except for Donna Kelly, the opportunity to continue employment with Reporting Services and, in fact, none of them continued their employment with Reporting Services after the sale. Because Defendants did not make continued employment available to any of the employees other than Donna Kelly, a partial plan termination occurred,[7] and Plaintiffs' accounts became nonforfeitable.

III. SECTION VIII OF THE PLAN DOES NOT VIOLATE, 26 U.S.C. § 411(d)(6)(B).

■ Plaintiffs contend that Section VIII of the Plan giving the Plan Administrator discretion in the method by which benefits may be paid out violates the Internal Revenue Code, 26 U.S.C. § 411(d)(6)(B) and the regulations promulgated thereto.[8] Section VIII of the Plan provides that within a reasonable period of time after the accounting date following his termination of employment, payment of the adjusted balances in the Participant's Accounts will be made by payment in a lump sum or by installments, and the "Plan Administrator, after consulting with the Participant, shall select the method of distributing his benefits to him.... In no event will distribution of a participant's benefits commence later than sixty (60) days after the last day of the Plan year in which the latest of the following events occurs: (1) the participant attains age 65 years; (2) the tenth anniversary occurs of the year in which the participant commenced participation in the Plan; or, (3) the participant terminates his service with the employer."

■ The Internal Revenue Code provides that an accrued benefit may not be decreased by an amendment to the plan and states that "a plan amendment which has the effect of eliminating ... an optional form of benefit, with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits." 26 U.S.C. § 411(d)(6)(B). There is no indication that Section VIII of the Plan came about by plan amendment. Where there is no amendment altering the method of payment of benefits, the statute on its face does not apply. *Dooley v. American Airlines, Inc.*, 797 F.2d 1447 (7th Cir.1986), *cert. denied* 479 U.S. 1032, 107 S.Ct. 879, 93 L.Ed.2d 833 (1987) and 479 U.S. 1087, 107 S.Ct. 1292, 94 L.Ed.2d 149 (1987) (change from fixed actuarial assumption to floating actuarial assumption which altered method for computing lump-sum payments to retired employees, and which was done pursuant to pension plan giving plan administrators authority to change actuarial assumptions from time to time, was not an amendment of the plan and therefore, not prohibited by identical language in ERISA which bars amendment of plan changing accrued benefit of participant); *Oster v. Barco of California Em-*

---

**7.** The fact that the employees may not have been required to accept employment with Dixon and could have done anything in this sense (to the extent not prohibited by the employment contracts assumed by Dixon), including accepting employment with Donna Kelly, if offered, is irrelevant in determining whether a partial plan termination occurred. The important factor is whether the employees had the opportunity to remain at Reporting Services/Kelly Reporting.

**8.** An identical provision is contained in ERISA, 29 U.S.C. § 1054(g).

*ployees' Retirement Plan*, 869 F.2d 1215 (9th Cir.1988) (no plan amendment under identical provision of ERISA where committee adopted policy regarding requests for lump sum distributions which applied to provision already part of plan giving committee discretion to determine method of payment). Accordingly, Section VIII of the Plan does not violate the Internal Revenue Code. 26 U.S.C. § 411(d)(6)(B).

## CONCLUSION

The departure of virtually all of Reporting Services' employees in connection with the April 28, 1989, sale of assets constituted a partial plan termination such that the amounts credited to the former Reporting Services' employees' accounts became nonforfeitable pursuant to 26 U.S.C. § 411. Plaintiffs' Motion for Summary Judgment is granted in part and denied in part. This Court will retain jurisdiction in anticipation of future proceedings not inconsistent with this opinion.