**Douglas MONKS, Plaintiff,**

v.

**KEYSTONE POWDERED METAL COMPANY, Defendant.**

No. 98–74379.

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 12, 2000.

David A. Nacht, Ann Arbor, MI, for plaintiff.

Richard J. Antoinelli, Robert A. Johnson and Rebecca J. Dick–Hurwitz, Pittsburgh, PA, for defendant.

## OPINION AND ORDER REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

On October 8, 1998, Plaintiff Douglas Monks commenced suit in this Court, alleging in his two-count Complaint that Defendant Keystone Powdered Metal Company failed to pay the full amount of benefits owed to him under the Group Pension Plan for Salaried Employees of Keystone Powdered Metal Company (the "Plan"), and that Defendant failed to provide a required notice of deferred pension benefits when Plaintiff reached his sixth-fifth birthday but continued to work for Defendant. This Court's subject-matter jurisdiction is founded upon Plaintiff's federal claims brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.

By cross-motions filed in May of 1999, both parties now seek summary judgment. The parties have filed responses to these cross-motions, and Defendant filed a reply brief in further support of its motion. On December 21, 1999, this Court heard oral argument on both motions. Having reviewed the briefs and supporting materials submitted by the parties, and having considered the arguments of counsel at the hearing, the Court is now prepared to rule on the parties' motions. This Opinion and Order sets forth that ruling.

Before turning to the merits of the parties' motions, however, the Court first must address a procedural matter. Specifically, although both parties seek summary judgment in their respective motions, the Sixth Circuit recently held in *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 619 (6th Cir.1998), that summary judgment is not an appropriate mechanism for resolving ERISA claims for benefits. Count I of Plaintiff's Complaint seeks precisely such an award of benefits and, therefore, is not amenable to resolution through summary judgment.[1] Rather, under the suggested guidelines set forth in *Wilkins,* this Court must conduct a review of the Plan administrator's decision "based solely upon the administrative record," and then "render findings of fact and conclusions of law accordingly." 150 F.3d at 619.[2]

In contrast, Count II of Plaintiff's Complaint, though captioned "ERISA DENI-

---

1. In his response to Defendant's motion, Plaintiff acknowledges that *Wilkins* "seems to eliminate summary judgment in ERISA cases," (Plaintiff's Response at 2 n. 1.), but argues that *Wilkins* is inapposite where the parties agree that there are no disputed issues of fact. The Court finds no support for such a distinction in *Wilkins,* which speaks broadly of "the proper method of adjudicating proceedings brought under 29 U.S.C. § 1132(a)(1)(B)," 150 F.3d at 617—*i.e.,* claims for benefits. Indeed, *Wilkins* seems to suggest that there will *never* be a genuine issue of material fact in cases involving review of a plan administrator's denial of benefits, because judicial review of such a denial must be confined to the record before the administrator. 150 F.3d at 618. Thus, the Court concludes that *Wilkins* governs its consideration of Count I of the Complaint, which alleges that Defendant denied Plaintiff the full amount of Plan benefits.

2. It follows that the Court may not consider the expert opinions, deposition testimony, and affidavits offered by the parties with regard to Count I of the Complaint, as these materials were not part of the administrative record. Under *Wilkins,* the "only exception" to this rule is evidence bearing upon a procedural challenge to the administrator's decision, "such as an alleged lack of due process afforded by the administrator or alleged bias on its part." 150 F.3d at 618. As discussed below, Plaintiff contends that Defendant acted with a conflict of interest in making its benefit determination, and this claim arguably permits scrutiny of the additional evidence offered by Plaintiff to the extent it bears upon this allegation of self-interested conduct. However, as also discussed below, none of the evidence submitted by Plaintiff appears to relate to this alleged conflict of interest.

AL OF BENEFITS," does not involve the review of a decision to award or deny benefits, but rather an alleged failure to give proper notice of the deferred payment of those benefits. This Count appears amenable to resolution through summary judgment and, therefore, will be addressed in accordance with the standards of Fed. R.Civ.P. 56.

## II. *FACTUAL BACKGROUND*[3]

Plaintiff Douglas Monks was hired by Keystone Carbon Company, the predecessor to Defendant Keystone Powdered Metal Company, in April of 1964, and remained an employee of Defendant (or its predecessor) until his retirement in July of 1998. Plaintiff worked as a salesperson, selling powdered metal parts manufactured by Defendant to the automobile and appliance industries in southeastern Michigan.

As an employee of Defendant, Plaintiff was at all times a participant in the Group Pension Plan for Salaried Employees of Keystone Powdered Metal Company (the "Plan"), or a similar plan offered by Defendant's predecessor. The Plan is entirely funded through employer contributions, and is administered by a committee appointed by Defendant's Board of Directors.

Upon his retirement on July 1, 1998, Plaintiff began receiving pension benefits under the Plan. A dispute as to the proper amount of these pension benefits forms the basis for Count I of Plaintiff's Complaint.

### A. The Terms of the Pre–1989 Plan

The Plan at issue in this case is a "defined benefit excess" plan. The Internal

Revenue Code provides that a "defined benefit" plan is "any plan which is not a defined contribution plan," 26 U.S.C. § 414(j), and the Code in turn defines a "defined contribution plan" as "a plan which provides for an individual account for each participant and for benefits based solely on the amount contributed to the participant's account," 26 U.S.C. § 414(i). In essence, then, a "defined benefit" plan is one in which the level of benefits is not linked to the amount of contributions, but instead is determined by using a formula. In this case, the level of benefits paid under the Plan is determined by a "unit credit" formula, which calculates benefits in accordance with the years of service as an employee by multiplying the years of service times a percentage of the employee's average monthly earnings. (Plaintiff's Motion, Ex. 5, Plan at 18.)

A plan is considered an "excess" plan if it computes benefits based on different percentages for earnings above and below an established "integration level," such that the percentage used for earnings above the "integration level" is higher than the percentage used for earnings below that level. *See* 26 C.F.R. § 1 401(*l* )–1(c)(16). The Plan in this case is an "excess" plan because, under the various formulas used to compute the level of pension benefits over the years, it used a lower percentage (ranging from 0.4% to 0.7%) for the first $600 of an employee's average monthly earnings and a higher percentage (ranging from 1.35% to 1.6%) for monthly earnings in excess of $600.[4]

---

**3.** As noted, the Court must render findings of fact with respect to Count I, while resolution of Count II requires the Court to consider whether there are any genuine issues of material fact. However, because the parties agree on the operative facts of this case, the following recitation of facts serves both purposes. To the extent that any findings of fact constitute conclusions of law, they are adopted as such.

**4.** This $600 "integration level" apparently derives from a past correlation between Plan

benefits and Social Security retirement benefits. Retired employees receive Social Security benefits only up to a defined "break point" in their annual earnings. Apparently, the Plan's $600/month "integration level" was established at some point in the past when the Social Security "break point" also was $600/month (or $7,200/year, roughly one-tenth of the current break point), presumably under the reasoning that Plan benefits were merely supplemental to Social Security benefits below that break point, but would become primary at salaries above that break point.

Prior to January 1, 1989, the formula used to compute the level of benefits paid under the Plan was as follows:

(a) 0.4% of the employee's Average Monthly Compensation up to $600, multiplied by years of Credited Service up to 25 years, **plus**

(b) 1.6% of the employee's Average Monthly Compensation in excess of $600, multiplied by years of Credited Service up to 25 years, **plus**

(c) 0.5% of the employee's Average Monthly Compensation, multiplied by years of Credited Service in excess of 25 years.

(*See* Defendant's Motion, Ex. B at 93, Summary Plan Description at 29.)

Under this formula, the pre–1989 Plan was a true "excess" plan for the first 25 years of an employee's service with Defendant, because a greater percentage (1.6%) was applied to earnings in excess of the $600 "integration level" than the percentage (0.4%) applied to earnings up to the integration level. However, the Plan ceased to be an "excess" plan once an employee achieved more than 25 years of service, as the same percentage (0.5%) would then apply to earnings above and below the integration level.

## B. Changes to the Plan in Light of the Tax Reform Act of 1986

The enactment of the Tax Reform Act of 1986 ("TRA"), Pub.L. No. 99–514, 100 Stat. 2085 (1986), had significant implications to the Plan. Among other things, the TRA strengthened the existing "non-discrimination" rules set forth in the Internal Revenue Code ("IRC"), particularly at IRC § 401, 26 U.S.C. § 401.[5] Under these amended rules, a pension plan such as Defendant's Plan may retain its status as a tax-qualified trust only if it does not disproportionately benefit "highly compensated employees."[6] In addition, the TRA amended IRC § 401 by adding § 401(a)(17), 26 U.S.C. § 401(a)(17), which imposes a $150,000 limit on the amount of annual compensation that may be taken into account in computing benefits under a tax-qualified plan.[7]

Section 401($l$)(3) of the IRC, 26 U.S.C. § 401($l$)(3), sets forth the criteria that a defined benefit excess plan must satisfy to retain its tax-qualified status. These rules do not altogether prohibit qualified plans from using a higher percentage to calculate benefits for earnings in excess of the "integration level," but instead impose a cap, or "[p]ermitted disparity," on the difference between the sub-integration and super-integration percentages used to compute benefits. *See* 26 U.S.C. § 401($l$). Specifically, the maximum permitted disparity between the lower percentage used for earnings below the integration level and the higher percentage used for earnings above that level is now 0.75%, and this disparity itself may not exceed the percentage used to compute sub-integration-level benefits. *See* 26 U.S.C. §§ 401($l$)(3)(A), 401($l$)(4)(A); *see also* 26 C.F.R. § 1.401($l$)–3(b) (Department of Treasury regulations implementing these IRC provisions).[8]

---

**5.** One commentator has described these anti-discrimination rules as "extraordinarily complex," noting that "[m]any statutory provisions and terms require detailed regulation," and opining that "[t]he proliferation of these rules and regulations has removed pension plan administration from the ambit of most attorneys and has dramatically increased the costs of plan administration." Joseph Bankman, *Tax Policy and Retirement Income: Are Pension Plan Anti–Discrimination Provisions Desirable?*, 55 U.Chi.L.Rev. 790, 799–800 (1988).

**6.** The IRC defines "highly compensated employees" as those with earnings in excess of $80,000. 26 U.S.C. § 414(q)(1)(B)(i). It is undisputed that Plaintiff was a "highly compensated employee" at all relevant times during his employment with Defendant.

**7.** This limit is adjusted annually to account for cost-of-living increases. *See* 26 U.S.C. § 401(a)(17)(B).

**8.** The Department of Treasury regulations contain a number of examples to aid understanding of the "permitted disparity" rules, including the following:

As can be seen by reviewing the Plan formula set forth above, the pre–1989 Plan did not conform to these anti-discrimination rules. First, the difference between the sub-integration percentage of 0.4% and the super-integration percentage of 1.6% exceeded the maximum permitted disparity of 0.75%. Next, the disparity itself, 1.2%, exceeded the 0.4% figure used to compute benefits for earnings below the $600 integration level. Accordingly, Defendant amended its Plan in June 1993, retroactive to January 1, 1989, adopting the following formula for computing pension benefits:

(a) 0.7% of the employee's Average Monthly Compensation up to $600, multiplied by years of Credited Service up to 25 years, **plus**

(b) 1.35% of the employee's Average Monthly Compensation in excess of $600, multiplied by years of Credited Service up to 25 years, **plus**

(c) 0.5% of the employee's Average Monthly Compensation, multiplied by years of Credited Service in excess of 25 years.

(*See* Plaintiff's Motion, Ex. 5, Plan at 18.) [9]

This modified formula alone, however, was not sufficient to bring Defendant's Plan into compliance with the TRA. In particular, if Defendant were simply to apply this new formula in place of the old formula beginning on its effective date of January 1, 1989, the retirement benefits of its highly compensated employees would suffer an immediate reduction, in violation of an IRC provision prohibiting any plan amendment that operates to decrease the accrued benefits of participants. *See* 26 U.S.C. § 411(d)(6)(A).[10] Moreover, although the TRA generally provided an effective date of January 1, 1989, for its various amendments, the implementing regulations to be issued by the Secretary of the Treasury, *see* 26 U.S.C. § 401(*l*)(5)(F), were not in fact issued until 1991 or later. This placed plan sponsors in the awkward position of having to amend their plans to retain their tax-qualified status, yet facing the prospect that these amendments might violate other IRC provisions, while lacking any guidance from the Department of Treasury as to the proper means of addressing this predicament.

To address these problems, the IRS issued a Notice on December 27, 1988, setting forth various "model amendments" that plan sponsors could adopt in the inter-

---

Plan P is a defined benefit excess plan that provides a normal retirement benefit of 0.5 percent of average annual compensation up to the integration level, plus 1.25 percent of average annual compensation in excess of the integration level, for each year of service up to 35. The disparity provided under the plan exceeds the maximum excess allowance because the excess benefit percentage (1.25 percent) exceeds the base benefit percentage (0.5 percent) by more than the base benefit percentage (0.5 percent). 26 C.F.R. § 1.401(*l*)–3(b)(5), Example 3. In this example, even though the disparity does not exceed the 0.75 percent limit allowed under 26 U.S.C. § 401(*l*)(4)(A)(i), it is not permissible because the disparity itself exceeds the 0.5 percent figure used to compute benefits for sub-integration earnings.

9. Although the Court need not decide whether the Plan as amended complies with the TRA's non-discrimination rules in all respects, this formula satisfies the requirements that the disparity between the sub-integration percentage (0.7%) and the super-integration percentage (1.35%) not exceed 0.75%, and that this disparity itself (0.65%) not exceed the sub-integration percentage (0.7%).

10. As an example, suppose that one of Defendant's employees earned $8,600 per month, or $103,200 per year, in 1988, and that he had completed 25 years of service by the end of that year. Under the pre–1989 formula, this employee's monthly retirement benefit would be $60 (the amount computed using the sub-integration percentage of 0.4%) plus $3,200 (the amount computed using the super-integration percentage of 1.6%), for a total of $3,260 per month. Under the new formula, however, this employee's monthly retirement benefit would be $105 (using the sub-integration percentage of 0.7%) plus $2,700 (using the super-integration percentage of 1.35%), for a total of $2,805 per month, a decrease of $455 per month.

im period before the implementing regulations were issued, in order to preserve their right to subsequently adopt retroactive plan amendments without violating the IRC. *See Scott v. Administrative Comm. of the Allstate Agents Pension Plan,* 113 F.3d 1193, 1195–96 (11th Cir.1997) (discussing this IRS Notice and its model amendments). In addition, the regulations ultimately issued by the Secretary of the Treasury included various "fresh-start" rules, under which plan sponsors could comply with the TRA on a going-forward basis without depriving plan participants of benefits accrued under a more favorable pre-TRA benefit formula. *See* 26 C.F.R. § 1.401(a)(4)–13(c) (setting forth the fresh-start rules and formulas applicable to defined benefit plans).

These fresh-start rules, while complicated, generally provided three different methods for plan sponsors to complete their transitions from pre-TRA to post-TRA benefit formulas. First, the sponsor could apply a "fresh-start without wear-away" formula, under which the participants' benefits are calculated by adding their accrued benefits under the pre-TRA formula for years of service through 1988 *plus* their benefits for post–1988 years of service computed under the post-TRA formula. *See* 26 C.F.R. § 1.401(a)(4)–13(c)(4)(i). Second, the sponsor could adopt a "fresh-start with wear-away" formula, under which a participant's benefits are the greater of (1) his accrued benefits under the pre-TRA formula for years of service through 1988, or (2) his benefits for all years of service, both pre– and post–1988, computed under the post-TRA formula. *See* 26 C.F.R. § 1.401(a)(4)–13(c)(4)(ii). Third, the sponsor could select a "fresh-start with extended wear-away" formula, under which a participant's bene-

fits would be determined through use of *either* the first ("fresh-start without wear-away") *or* the second ("fresh-start with wear-away") formula, whichever produced the greater benefits. *See* 26 C.F.R. § 1.401(a)(4)–13(c)(4)(iii).

Defendant amended the Plan in 1993 to implement the third of these "fresh-start" rules—*i.e.,* the "fresh-start with extended wear-away" formula—which, in turn, incorporates both the "fresh-start without wear-away" and "fresh-start with wear-away" formulas, applying the formula that produces the greater benefit for each individual Plan participant.[11] The parties agree that Plaintiff receives a greater benefit using the "fresh-start without wear-away" formula, set forth in the Plan as follows:

> the Employee's benefit as of the end of the 1988 Plan Year calculated using the Employee's Average Monthly Compensation Part A [*i.e.,* average monthly compensation determined as of December 31, 1988], Credited Service and benefit formula in effect as of December 31, 1988 [*i.e.,* the pre-TRA formula] *plus* the Employee's benefit for Plan years beginning on or after January 1, 1989 and prior to January 1, 1994 using the Employee's Credited Service for Plan Years on or after January 1, 1989 and prior to January 1, 1994, Average Monthly Compensation Part B–1 [*i.e.,* average monthly compensation computed using 1989–93 earnings] and the benefit formula effective January 1, 1989 [*i.e.,* the post-TRA formula] *plus* the Employee's benefit for Plan Years beginning on or after January 1, 1994 calculated using the Employee's Average Monthly Compensation Part C [*i.e.,* average monthly compensation computed using post–1993

---

**11.** For reasons that are not entirely clear, however, the transition rule set forth in the post-TRA Plan divides the calculation of benefits into *three* rather than *two* segments: benefits accrued through 1988 under the pre-TRA formula, benefits accrued during the plan years between 1989 and 1993, and benefits accrued during plan years 1994 and beyond.

(*See* Plaintiff's Motion, Ex. 5, Plan at 18–19.) Presumably, the additional 1989–1993 segment was put into place to somehow account for the interim period between the effective date of the TRA (January 1, 1989) and the date Defendant amended the Plan (in June of 1993).

earnings], Credited Service on or after January 1, 1994 and benefit formula effective January 1, 1989 [*i.e.,* the post-TRA formula] . . . .

(Plaintiff's Motion, Ex. 5, Plan at 18.) [12]

This formula, while exceedingly complex to state, essentially computes benefits by adding the amount accrued prior to 1989 under the pre-TRA formula and the amount accrued in years 1989 and beyond under the post-TRA formula. As explained below, the crux of the parties' dispute in this case involves the proper determination of the years of "Credited Service" when calculating benefits under the post-TRA formula.

## C. Defendant's Calculation of Plaintiff's Retirement Benefits under the Plan

In September of 1990, Plaintiff asked Defendant to calculate the retirement benefits he was eligible to receive under the Plan. In response, on October 24, 1990, Defendant's Director of Human Resources, William Reuscher, provided Plaintiff with two worksheets. The first computed Plaintiff's accrued benefits under the pre-TRA formula, calculated using Plaintiff's 25 years of service from 1964 through 1988, and showed the amount of these accrued monthly benefits as $4,547.71. (Defendant's Motion, Ex. B at 107.) The second computed Plaintiff's benefits under the post-TRA formula, calculated using Plaintiff's 25 years of service from 1964 through 1988 plus eight additional years of service from 1989 through 1996, when Plaintiff would attain the Plan's "normal retirement age" of 65. This second worksheet showed the amount of Plaintiff's monthly retirement benefits as $4,547.69, or slightly less than the amount Plaintiff had already accrued by 1988 under the pre-TRA formula. (*Id.* at 108.) [13]

On June 25, 1997, Plaintiff again asked Defendant to calculate his retirement benefits, based on a projected retirement date of January 1, 1998. On February 23, 1998, Defendant responded to this request by letter from David A. Stocklas, manager of actuarial services for the Plan's actuary, MMC & P. (*Id.* at 100–03.) This letter, along with an attached worksheet, computed Plaintiff's benefits under four different formulas:

(1) $4,547.71—benefits accrued through 1988 under pre-TRA formula (the same amount computed in response to Plaintiff's 1990 request);

(2) $4,747.50—benefits calculated entirely under post-TRA formula, using an average monthly compensation derived from Plaintiff's highest average monthly earnings over any consecutive 5–year period of his employment;

(3) $4,586.99—benefits again calculated entirely under post-TRA formula, but broken down into two segments before and after December 31, 1993, with average monthly compensation for the first period derived from Plaintiff's highest average monthly earnings over any consecutive 5–year period prior to 12/31/93, and average monthly compensation for the latter period derived from Plaintiff's (higher) average monthly earnings since 1/1/94; and

(4) $5,106.64—benefits calculated under "fresh-start without wear-away" approach, adding Plaintiff's benefits accrued through 1988 under pre-TRA formula *plus* Plaintiff's benefits accrued from 1989 through 1997 under post-TRA formula.

**12.** As discussed below, the various terms in this formula (*e.g.,* Average Monthly Compensation and Credited Service) are defined elsewhere in the Plan document.

**13.** Plaintiff was not provided with a calculation of his benefits using the "fresh-start

without wear-away" formula, under which Plaintiff's benefits would equal the amount he accrued through 1988 under the pre-TRA formula ($4,547.71) *plus* the amount he would accrue from 1989 through 1996 under the post-TRA formula.

(*Id.* at 103.) Accordingly, this letter indicated that Plaintiff's projected monthly retirement benefit would be $5,106.64, based on a retirement date of December 31, 1997.

On April 8, 1998, Plaintiff wrote to Defendant's chief financial officer, C.J. Kogovsek, who currently is responsible for administering the Plan. In this letter, Plaintiff objected to the calculation of benefits set forth in Defendant's February 23, 1998 letter, arguing that Defendant had not properly determined the years of service to be used when applying the post-TRA formula. (*Id.* at 99.) Plaintiff's calculations apparently reflected that he was entitled to a retirement benefit in excess of $6,000 per month.[14] Mr. Kogovsek responded to this letter on April 9, 1998, reiterating Defendant's position that the calculations shown in the February 23 letter were correct.[15]

## D. Plaintiff's Retirement

Plaintiff retired on July 1, 1998. When Defendant began to pay monthly retirement benefits in the amount set forth in its February 23 letter, rather than the amount calculated by Plaintiff, this lawsuit followed. In Count I of his Complaint, Plaintiff seeks the additional retirement benefits allegedly owed to him under his construction of the Plan's post-TRA benefit formula. In Count II, Plaintiff alleges that Defendant failed to provide notice of its deferral of Plaintiff's retirement benefits—a notice purportedly required under ERISA and under the terms of the Plan—when Plaintiff continued to work beyond his normal retirement date of June 3, 1996.

14. Although Plaintiff's letter referred to an attached worksheet showing his calculations, this worksheet does not appear in the record provided to the Court.

15. Defendant now concedes that one of its calculations was incorrect, though not in the way contended by Plaintiff. (*See* Defendant's Motion, Br. in Support at 13 n. 9.) Defendant's error apparently involved the use of the

## III. *ANALYSIS*

### A. Plaintiff's Count I Claim for Additional Benefits

#### 1. The Standard of Review Governing Plaintiff's Claim for Benefits

Before turning to the merits of Plaintiff's claim for additional benefits under the Plan, the Court first must determine the standard of review governing its consideration of this claim. Not surprisingly, Plaintiff asserts that the Plan administrator's determination of the amount of his retirement benefits should be reviewed *de novo*, while Defendant maintains that the less exacting "arbitrary and capricious" standard should apply. The Court finds that Defendant has the better of this argument.

A participant or beneficiary of an ERISA plan may bring suit in federal district court to recover benefits allegedly due under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B). Courts review such challenges to benefit determinations under the *de novo* standard, unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. In this latter case, the administrator's benefit determination is reviewed under an "arbitrary and capricious" standard. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989).

The Plan in this case addresses the degree of the administrator's discretion through the following language:

> *10.02 Duties....* The Administrator will resolve any factual dispute, giving due weight to all evidence available to

years 1993–97 to compute Plaintiff's average monthly compensation over the post–1994 period, rather than the proper range of 1994–97. The correction of this error increases Plaintiff's monthly benefit by $1.04, and Defendant states that it will pay this additional amount to Plaintiff retroactive to his retirement date.

it. The Administrator will interpret the Plan and determine all questions arising in the administration, interpretation and application of the Plan. All such determinations shall be final, conclusive and binding except to the extent that they are appealed under Article VIII.

(Plaintiff's Motion, Ex. 5, Plan at 42.) [16]

This language suffices to confer upon the Plan administrator the discretionary authority to interpret the Plan. The Sixth Circuit has repeatedly held that discretionary authority to construe the terms of a plan triggers application of the "arbitrary and capricious" standard of review. *See, e.g., Bagsby v. Central States, Southeast & Southwest Areas Pension Fund,* 162 F.3d 424, 428 (6th Cir.1998); *Smith v. Ameritech,* 129 F.3d 857, 863 (6th Cir. 1997). This is true even where, as here, the Plan does not use the word "discretion" or other such "magic words" in conferring powers upon the administrator. *See Administrative Comm. of the Sea Ray Employees' Stock Ownership & Profit Sharing Plan v. Robinson,* 164 F.3d 981, 986 (6th Cir.1999); *Perez v. Aetna Life Ins. Co.,* 150 F.3d 550, 555 (6th Cir.1998). In light of the above-quoted language giving the Plan administrator the unqualified authority to "interpret the Plan," and in light of the additional language confirming that such determinations are "final, conclusive and binding," the Court concludes that the Plan administrator has discretionary authority to construe the terms of the Plan.

Plaintiff does not deny that this language, viewed in isolation, confers such discretionary authority upon the administrator. Nevertheless, Plaintiff contends that this authority is tempered by the language that follows, providing that the ad-

ministrator's determinations are "final, conclusive and binding except to the extent that they are appealed." Plaintiff notes that he has indeed appealed the administrator's decision, and reasons that this lack of finality of a challenged decision overcomes the administrator's discretionary authority to make this non-final determination.

Plaintiff, however, has identified no case law in support of his position, and this Court's research likewise has failed to disclose any such cases. This is hardly surprising, when one considers the broad reach of Plaintiff's argument. Plaintiff's position, if accepted, would mean that plan administrators *never* have discretionary authority in cases brought before the federal courts because, in *all* such cases, the administrator's decision is susceptible to reversal, and hence is not "final, conclusive and binding." Simply stated, the mere fact that an administrator's decision is subject to review, modification, and perhaps reversal on appeal to the District Court says *nothing* about the discretion given to the administrator to make that decision in the first instance.[17]

Next, Plaintiff contends that the Plan administrator's discretionary authority does not extend to the situation presented in this case, where the administrator's interpretation of the Plan allegedly amounts to an amendment of the Plan. Where, in Plaintiff's view, the Plan administrator clearly has exceeded his authority by effectively modifying the terms of the Plan, Plaintiff asserts that a *de novo* standard should apply.

Plaintiff's reasoning, however, is wholly circular, and would render impossible any determination of the proper standard of review. In essence, the proposition ad-

---

**16.** The "appeal[ ] under Article VIII" referred to in this provision is an appeal to the Plan Administrator. (*Id.* at 39.)

**17.** Moreover, Defendant points out that the appeal referred to in § 10.02 of the Plan is in fact an appeal *to the administrator.* (*See*

Plaintiff's Motion, Ex. 5, Plan at 39.) Thus, far from removing any discretionary authority from the administrator, the language cited by Plaintiff actually confers additional authority on the administrator to reverse his own decision on appeal.

vanced by Plaintiff, if accepted, would require the Court *first* to determine whether the administrator's interpretation of the Plan is tantamount to amending the Plan, and *then*, depending on the answer to this question, to apply either a *de novo* or arbitrary and capricious standard of review. This approach begs the question of which standard should govern the first part of this inquiry. In addition, this approach is directly contrary to the teachings of *Firestone* and the relevant Sixth Circuit precedents: namely, that the standard of review should be determined solely by reference to the terms of the Plan itself, *see, e.g., Bagsby, supra,* 162 F.3d at 428, and not through a result-driven inquiry into the facial "soundness" of the administrator's decision or the plan participant's challenge to that decision.[18]

██ Accordingly, the Court concludes that the "arbitrary and capricious" standard governs its review of the challenged decision. Under this "least demanding form of judicial review," *Robinson,* 164 F.3d at 989, the Court must uphold a benefit determination if it is "rational in light of the plan's provisions." *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 381 (6th Cir.1996) (internal quotations and citations omitted). Stated differently, "[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Finance Cos. Retirement Plan,* 887 F.2d 689, 693 (6th Cir.1989) (internal quotations and citations omitted), *cert. denied,* 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 288 (1990).

As Plaintiff correctly points out, however, this Court's generally deferential review of the benefit determination at issue here is tempered by two principles. First, because the Plan is funded solely by Defendant, and is administered by a committee appointed by Defendant's Board of Directors, Defendant plainly has a financial incentive to construe the Plan as requiring payment of less rather than more benefits. The "possible conflict of interest" inherent in this situation "should be taken into account as a factor in determining whether the [administrator's] decision was arbitrary and capricious." *Davis,* 887 F.2d at 694; *see also Cochran v. Trans–General Life Ins. Co.,* 60 F.Supp.2d 693, 698–99 (E.D.Mich.1999) (emphasizing that the existence of a possible conflict of interest does not require application of the *de novo* standard, but must be weighed as a factor in applying the "arbitrary and capricious" standard). Next, to the extent that the Plan's language is ambiguous, this Court should apply the "rule of *contra proferentum*" and construe such ambiguities against Defendant as the drafting party. *Perez, supra,* 150 F.3d at 557 n. 7. The Court will apply these standards in reviewing the administrator's determination of Plaintiff's retirement benefits under the Plan.

### 2. The Challenged Benefit Determination Is Neither Arbitrary Nor Capricious.

Turning to the merits of Count I of the Complaint, Plaintiff alleges that the Plan administrator incorrectly applied the post-TRA formula set forth above in determin-

---

**18.** Plaintiff also maintains that the administrator's decision must be reviewed under a *de novo* standard to the extent it is based on an analysis of law or statutory interpretation. Though this argument has some facial appeal, the case cited by Plaintiff, *Counts v. Kissack Water & Oil Serv., Inc.,* 986 F.2d 1322 (10th Cir.1993), does not support this proposition. Further, the Sixth Circuit has rejected a similar argument, declining to adopt a *de novo* standard for reviewing eligibility determinations that purportedly involved only "ques-

tions of law." *Robinson, supra,* 164 F.3d at 986–87. In any event, while Defendant has incorporated legal analyses of IRC provisions and federal regulations into its arguments before this Court, nothing in the administrative record suggests that the calculation of Plaintiff's retirement benefits was in any way influenced by the administrator's interpretation of federal law or regulations, as opposed to the administrator's interpretation of the language of the Plan itself.

ing the amount of his retirement benefits. In essence, Plaintiff contends that Defendant erroneously counted all of his post–1988 years of service as "years of Credited Service in excess of twenty-five (25) years" under the third portion of the post-TRA formula, rather than treating the years 1989–1993 as years zero through five for purposes of the 1989–93 transitional formula, and again treating the years 1994–1998 as years zero through five for purposes of the new formula governing years 1994 and beyond. Upon reviewing the relevant Plan language, however, the Court finds that Defendant's interpretation is eminently rational and reasonable.

The parties' dispute turns entirely on the proper application of the post-TRA formula, which reads in full:

> *4.01 Accrued Benefit Formula.* Subject to the provisions of Sections 4.05 and 4.06, the amount of Monthly Retirement Income payable under the Plan in the Basic Form commencing on the Participant's Normal Retirement Date shall be the sum of the amounts set forth in subsections (a), (b) and (c) below:
>
> (a) Seven tenths of one percent (.7%) of the first six hundred dollars ($600) of the Participant's Average Monthly Compensation multiplied by his years of Credited Service (not to exceed twenty-five (25) years); plus
>
> (b) One and thirty-five hundredths of one percent (1.35%) of the Participant's Average Monthly Compensation in excess of six hundred dollars ($600) multiplied by his years of Credited Service (not to exceed twenty-five (25) years); plus
>
> (c) One-half of one percent (.5%) of the Participant's Average Monthly Compensation multiplied by his

years of Credited Service in excess of twenty-five (25) years.

(Plaintiff's Motion, Ex. 5, Plan at 18.)

All would presumably agree that this formula, if applied in isolation, would compute Plaintiff's monthly retirement benefit using the sub-integration (0.7%) and super-integration (1.35%) percentages for his first 25 years of service, and using the flat rate of 0.5% for all years in excess of 25. Because Plaintiff attained 25 years of service in 1988, this formula would cease to be "excess" for Plaintiff's years of service in 1989 and beyond, and would increase his monthly retirement benefit only by 0.5% of his average monthly earnings for each year he worked after 1988.

The difficulty comes, however, when this fairly straightforward formula is applied in combination with the "fresh-start" rules adopted to carry out the transition from the pre-TRA to the post-TRA formula without decreasing the accrued benefits of Plan participants. The relevant "fresh-start" rule used to determine Plaintiff's benefits was set forth above, but is reproduced again here for convenience:

> Effective December 31, 1993, in calculating the Accrued Benefit for a Participant who is subject to the limitation contained in Code Section 401(a)(17) under Section 4.01 of this Plan [*i.e.*, highly compensated employees such as Plaintiff], the Average Monthly Compensation used in calculating the Monthly Retirement Income shall be calculated in accordance with (i), (ii) or (iii) below, whichever provides the greatest benefit: [19]
>
> (i) the Employee's benefit as of the end of the 1988 Plan Year calculated using the Employee's Average Monthly Compensation Part A [*i.e.*, average monthly compensation determined as of December 31, 1988], Credited Service and benefit formula in effect as of December 31, 1988 [*i.e.*, the pre-

---

**19.** Because the parties agree that subsection (i) produces the greatest benefit for Plaintiff, subsections (ii) and (iii) are omitted.

TRA formula] *plus* the Employee's benefit for Plan years beginning on or after January 1, 1989 and prior to January 1, 1994 using the Employee's Credited Service for Plan Years on or after January 1, 1989 and prior to January 1, 1994, Average Monthly Compensation Part B–1 [*i.e.*, average monthly compensation computed using 1989–93 earnings] and the benefit formula effective January 1, 1989 [*i.e.*, the post-TRA formula] *plus* the Employee's benefit for Plan Years beginning on or after January 1, 1994 calculated using the Employee's Average Monthly Compensation Part C [*i.e.*, average monthly compensation computed using post–1993 earnings], Credited Service on or after January 1, 1994 and benefit formula effective January 1, 1989 [*i.e.*, the post-TRA formula] . . . .

(Plaintiff's Motion, Ex. 5, Plan at 18.)

The first part of this fresh-start rule is straightforward, calling for computation of a portion of Plaintiff's retirement benefit based on his first 25 years of service from 1964 through 1988, and using the pre-TRA formula. Plaintiff does not challenge this portion of Defendant's benefit determination.

The crux of the dispute in this case involves the next two steps in the calculation. First, having computed a participant's benefit through 1988 using the pre-TRA formula, the fresh-start rule calls for the addition of "the Employee's benefit for Plan years beginning on or after January 1, 1989 and prior to January 1, 1994 using the Employee's Credited Service for Plan Years on or after January 1, 1989 and prior to January 1, 1994, Average Monthly Compensation Part B–1 [*i.e.*, average monthly compensation computed using 1989–93 earnings] and the benefit formula effective January 1, 1989 [*i.e.*, the post-TRA formula]."

In its computation of this portion of Plaintiff's retirement benefit, Defendant set the "years of Credited Service" in parts (a) and (b) of the post-TRA formula at zero (0), and the "years of Credited Service in excess of twenty-five (25) years" in part (c) of the post-TRA formula at five (5). Defendant reasoned that Plaintiff had already attained 25 years of service before 1989, so that all of his "Credited Service for Plan Years on or after January 1, 1989 and prior to January 1, 1994," as stated in the fresh-start rule, involved "years of Credited Service in excess of twenty-five (25) years" within the meaning of part (c) of the post-TRA formula. Because Plaintiff's five years of service between 1989 and 1993 were his 26th through 30th years of overall service, Defendant determined that all of these years of service were in excess of 25 years of service, and thus were governed by part (c) of the benefit formula. Under Defendant's interpretation, therefore, each year of Plaintiff's service between 1989 and 1993 increased his monthly benefit by only 0.5% of his average monthly compensation during that 1989–93 period.

In contrast, Plaintiff contends that his benefit accrual during this 1989–93 period should be determined by setting the "years of Credited Service" in parts (a) and (b) of the post-TRA formula at five (5), and the "years of Credited Service in excess of twenty-five (25) years" in part (c) of the formula at zero (0). Plaintiff reasons that, under the plain language of the fresh-start rule, he had five years of "Credited Service for Plan Years on or after January 1, 1989 and prior to January 1, 1994," regardless of how many years of credited service he might have achieved before January 1, 1989. Because these five post–1988 years are not "in excess of twenty-five (25) years" within the meaning of part (c) of the formula, but instead are years zero through five of Plaintiff's service between 1989 and 1993, Plaintiff argues that the excess (0.7%/1.35%) portion of the post-TRA formula should apply to these years, and not the flat-rate (0.5%) portion of that formula. Under this construction, Plaintiff's monthly retirement benefit would

continue to increase during his 1989–93 years of service by 0.7% of the sub-integration amount of his average monthly earnings during this period, plus 1.35% of the super-integration amount of his average monthly earnings for 1989–93.

The parties offer similarly divergent interpretations of the final portion of the fresh-start rule, under which benefits are computed for years of service 1994 and beyond. Defendant argues that Plaintiff completed his 31st through 35th years of service from 1994 until his retirement in 1998, and that part (c) of the post-TRA formula continues to govern these additional years of service in excess of 25 years. For his part, Plaintiff argues that his years of service from 1994 through 1998 were years zero through five of his "Credited Service on or after January 1, 1994" under the fresh-start rule, and that parts (a) and (b) of the post-TRA formula continue to govern these years.

■ Although Plaintiff's proposed construction is not wholly without support in the literal (and somewhat abstruse) language of the fresh-start rule, the Court concludes that Defendant's interpretation is the more plausible one and, in any event, is sufficiently rational to satisfy the lenient "arbitrary and capricious" standard of review. The Plan defines "Credited Service" as "the total number of calendar years for which a Participant is given credit in calculating Monthly Retirement Income or Death Benefits," and further provides that "Credited Service shall be credited **in the aggregate** as of any date of determination." (Plaintiff's Motion, Ex. 5, Plan at 8 (emphasis added).) This definition certainly suggests that the years of Credited Service as referenced in the post-TRA formula should be determined "in the aggregate" as the "total number of calendar years" worked by Plaintiff, and not determined solely by reference to the number of years worked between 1989–93 or between 1994–98.

Moreover, even the fresh-start language cited by Plaintiff—*i.e.*, the references to "Credited Service for Plan Years on or after January 1, 1989 and prior to January 1, 1994," and to "Credited Service on or after January 1, 1994"—does not ineluctably lead to the result advocated by Plaintiff. A fair reading of this language, as applied to Plaintiff's particular circumstances, could rationally lead to the conclusions that Plaintiff's "Credited Service" for the 1989–93 plan years encompassed his 26th through 30th years of service, and that his "Credited Service on or after January 1, 1994" encompassed his 31st through 35th years of service. Applying each of these 26th through 35th years of service to the post-TRA formula, each year falls within part (c) of the formula as a year of service "in excess of twenty-five (25) years." Each of these years, therefore, increases Plaintiff's monthly benefit by 0.5% of his average monthly compensation, as computed by reference to the relevant 1989–93 or post–1993 period. As this would be the undeniable result if the Plan's calculation of benefits were not broken into three segments (pre–1989, 1989–93, and post–1993), it is not clear why the same formula should necessarily produce a different result simply because it is applied cumulatively to separate portions of Plaintiff's total 35 years of service.

Plaintiff argues, however, that Defendant's interpretation is untenable because it improperly "transforms" his five years of service between 1989–93 into zero years of service, and also "transforms" his five years of service between 1994–98 into zero years of service. This simply is not the case. All are agreed that Plaintiff did in fact attain five years of service between 1989 and 1993, and five more years of service between 1994 and 1998. The only question is whether these were all years "in excess of 25 years," as Defendant contends, or years zero through five of the relevant time period, as Plaintiff maintains. The Court finds nothing irrational in Defendant's position that the years of service should not be reset to zero when computing each separate component of

Plaintiff's benefit under the fresh-start rule.

Admittedly, the three-part formula used to compute Plaintiff's benefits is complex, and perhaps could have been worded more clearly. Yet, Plaintiff apparently does not dispute that this tripartite scheme is intended, and indeed necessary, to make the transition from the pre-TRA to the post-TRA formula, while ensuring that the vested benefits of pre–1989 employees are preserved, and also ensuring that the Plan complies with the Department of Treasury's "fresh-start" rules during the transitional period from the old to the new formula. Given these disparate purposes, it is not enough for Plaintiff to point to the complexity of the formula as proof of its purported ambiguity and support for his alternate construction. Rather, "[t]he mere fact that language could have been clearer does not necessarily mean that it is not clear enough" to sustain Defendant's interpretation under the deferential "arbitrary and capricious" standard of review. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir.1996).[20]

Moreover, various traditional rules of contract construction support Defendant's position. First, it is well established that "each provision of a contract should be interpreted as part of an integrated whole, to the end that *all* of the provisions may be

given effect if possible." *Musto v. American Gen. Corp.*, 861 F.2d 897, 906 (6th Cir.1988). Plaintiff's interpretation, if accepted, would render part (c) of the post-TRA formula inapplicable to *any* employee when computing benefits for the years 1989–93, because no employee could possibly attain more than five years of service during that period alone. Similarly, Plaintiff's proposed construction does not easily harmonize with the Plan definition of "Credited Service" as the *total* number of calendar years worked, to be determined "in the aggregate as of any date of determination." Rather, the approach advocated by Plaintiff would partition an employee's years of credited service into the three distinct periods of pre–1989, 1989 through 1993, and 1994 and beyond.

■ Next, a contract should not be construed in such a way that it calls for an illegal result or runs counter to the law. *Cf. Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77, 102 S.Ct. 851, 856, 70 L.Ed.2d 833 (1982) ("There is no statutory code of federal contract law, but our cases leave no doubt that illegal promises will not be enforced in cases controlled by the federal law."). Plaintiff's proposed construction of the Plan would run afoul of this principle in several respects. First, the Treasury regulations implementing the TRA provide

---

**20.** This point is well illustrated through the testimony of Plaintiff's own expert, Joseph Esuchanko. While the Sixth Circuit's ruling in *Wilkins* prohibits resort to this testimony in deciding Plaintiff's claim for benefits, the Court nevertheless finds it instructive to note Mr. Esuchanko's response when asked how Defendant should have written the formula to achieve the result it now advocates:

> Where it says, using the employee's credited service for plan years on or after January 1, 1989 and prior to January 1, 1994, I would have added the words "in excess of credited service through December 31, 19[8]8." Similarly, in the last section of (i), where it says, credited service on and after January 1, 1994, I would have added the words "in excess of credited service through December 31, 1993."

(Plaintiff's Motion, Ex. 2, Esuchanko Dep. at 64.)

It is extremely debatable whether this proposed "in excess" language would have better or more clearly achieved the result sought by Defendant. Under this alternate formulation, Plaintiff's years of service between 1989 and 1993 seemingly would have been years zero through five of his credited service "in excess of" his credited service accumulated through December 31, 1988, and his years of service from 1994 until his retirement in 1998 likewise would have been years zero through five of his credited service "in excess of" his credited service through December 31, 1993. Yet, this is the outcome advocated by Plaintiff, not Defendant. The inability of Plaintiff's expert to identify any clearer way to articulate the result sought by Defendant indicates that the language chosen by Defendant to attain its goal was reasonable and sufficiently clear under the circumstances.

that any disparity permitted under a defined benefit excess plan must be "uniform," and further state that "[t]he disparity provided under a defined benefit excess plan is uniform only if the plan uses the same base benefit percentage and the same excess benefit percentage for all employees with the same number of years of service." 26 C.F.R. § 1.401($l$)–3(c)(1).[21] As Defendant points out, the interpretation advanced by Plaintiff seemingly would fail to produce a "uniform disparity," as it would favor an employee who acquired years of service prior to the "fresh-start" date of January 1, 1989 over an employee who began working for Defendant in 1989 or later, even where those employees might have the same overall years of service.

To see why this is so, consider an employee who, like Plaintiff, began working for Defendant prior to 1989. Under Plaintiff's interpretation of the Plan, this employee would enjoy more than 25 years of benefits computed under the advantageous "excess" formula, because his years of service prior to 1989 would not count toward his "years of Credited Service in excess of twenty-five (25) years" under part (c) of the post-TRA formula.[22] In contrast, an employee who began working for Defendant in 1994 or thereafter would enjoy only 25 years of benefits computed under the "excess" formula, and then would accrue additional benefits only under the more modest 0.5% flat-rate provision at part (c) of the post-TRA formula. Thus, two employees with the same total number of years of service would accrue different amounts of benefits under different portions of the post-TRA formula, in apparent violation of the "uniform disparity" requirement.[23]

The interpretation advanced by Plaintiff also would exacerbate the Plan's existing violation of the maximum total disparity limit set forth at IRC § 401($l$)(4)(A)(ii), 26 U.S.C. § 401($l$)(4)(A)(ii). As discussed earlier, the TRA prohibits disparities of more than 0.75% between the percentage applied to sub-integration earnings and the "excess" percentage applied to earnings above the integration level. *See* 26 U.S.C. § 401($l$)(4)(A)(i). The TRA also establishes a "lifetime" maximum disparity, or "maximum excess allowance," providing that the annual disparities accumulated over all years of service, not to exceed 35, may not exceed 0.75% times the years of

---

**21.** The regulations provide the following example:

> Example 1. Plan M is a defined benefit excess plan.... The plan provides a normal retirement benefit of 1.0 percent of average annual compensation up to the integration level, plus 1.65 percent of average annual compensation in excess of the integration level, for each year of service up to 25. The plan also provides a benefit of 1.0 percent of all average annual compensation for each year of service in excess of 25. The disparity provided under the plan is uniform because the plan uses the same base and excess benefit percentages for all employees with the same number of years of service. If the plan formula were the same except that it used a different excess benefit percentage for some of the years of service between one and 25, the disparity under the plan would continue to be uniform.

26 C.F.R. § 1.401($l$)–3(c)(3), Example 1.

**22.** Indeed, in Plaintiff's view, this hypothetical employee's years of service between 1989 and 1993 also would not count toward this 25–year limit, as his years-of-service "clock" is again reset to zero at plan year 1994. This employee would not reach the 25–year limit, and thus fall within part (c) of the post-TRA formula, until he worked 25 years *after* January 1, 1994.

**23.** Plaintiff dismisses this concern as purely hypothetical, and hence "speculative and farfetched." (Plaintiff's Response to Defendant's Motion, at 10.) It is unclear how Plaintiff can be so certain that this apparent disparity is indeed only hypothetical. Instead, it appears that this disparity will be realized even if Defendant has hired only *one* employee since 1994 who is covered under the Plan and remains employed by Defendant for more than 25 years. Moreover, since IRC § 401 and the Treasury regulations speak of required or prohibited plan features or formulas, and not specific outcomes, it is by no means apparent that the Plan could not lose its tax-qualified status based solely on the "hypothetical" disparity outlined above.

service. 26 U.S.C. § 401($l$)(4)(A)(ii). Thus, for an employee such as Plaintiff with 35 years of service, the lifetime "excess allowance" may not exceed 35 times 0.75%, or 26.25 percent.

Over his first 25 years of service through 1988, Plaintiff's "excess allowance" was 25 years times 1.2% per year (the disparity under the pre-TRA formula), or 30 percent. Thus, he had already exceeded the maximum "excess allowance" now permitted under the TRA. Yet, under his interpretation of the Plan, he would be permitted to continue increasing his excess allowance throughout the ten years until his retirement in 1998 (and beyond, if he had continued working). Specifically, if, as Plaintiff contends, he maintained his eligibility for "excess" benefits throughout this ten-year period, his 30% excess allowance in 1988 would have grown to 36.5% by 1998, as the post-TRA formula establishes a 0.65% disparity between the sub-integration and super-integration percentages. Thus, Plaintiff's proposed interpretation would bring the Plan farther out of compliance with the TRA with respect to pre-TRA employees such as Plaintiff.

Finally, in considering whether Defendant's benefit determination is arbitrary and capricious, the Court should not disregard one of the principal purposes of the TRA—namely, "to eliminate perceived discrimination in favor of highly compensated employees." *Scott, supra,* 113 F.3d at 1195. The "fresh-start" rules were issued by the Department of Treasury, and presumably incorporated into the Plan, to ensure a transition that would advance this anti-discriminatory purpose while preserving vested interests.

The Plan interpretation adopted by Defendant achieves both of these goals by phasing in the post-TRA formula while preserving Plaintiff's accrued pre-TRA benefits—and, in fact, allowing those monthly benefits to continue to accrue, growing from $4,547.71 in 1988 to $5,169.98 upon his retirement in 1998. Indeed, by virtue of the Plan's preservation of pre-TRA accruals, Plaintiff retains the full benefit of *25 years* of pension calculations under the pre-TRA formula, with its disparity significantly in excess of the disparity now permitted under the TRA.[24] In contrast, the interpretation favored by Plaintiff would perpetuate his accumulation of benefits under the "excess" formula, even beyond the 25–year period permitted under the pre-TRA formula. This goes beyond mere "grandfathering," and instead seeks to *enhance* Plaintiff's benefits as a highly compensated employee following the enactment of the TRA.

As Plaintiff correctly observes, such considerations of "purpose" or "intent" would be inappropriate and irrelevant if the plain language of the Plan required a different result.[25] However, as discussed above, the Court does not so construe the disputed language. Rather, having navigated through the largely uncharted and sometimes murky waters of interpreting pre- and post-TRA formulas and "fresh start" rules, as well as considering IRC § 401 and the often cumbersome Treasury regulations, the Court finds Defendant's interpretation eminently rational as a matter of contract construction. The Court merely observes, in addition, that this result finds further support in the purposes behind the TRA.

---

24. In other words, Plaintiff's 25 years of service through 1988 renders him uniquely immune from the effects of the TRA. He obtained a full 25 years of benefits calculated under the "excess" portion of the pre-TRA formula, just as he would have if the TRA had never been enacted and the pre-TRA formula had remained in effect. He then continued to accrue benefits at the "non-excess" rate of 0.5% for each year of service beyond 1988,

precisely as he would have if the pre-TRA formula had remained in effect.

25. This is particularly true where, as here, the administrative record does not indicate that considerations such as the purpose of the TRA or the intent behind the Plan's "fresh-start" rules played any role in the challenged benefit determination.

■ Finally, the Court must consider whether Defendant's conflict of interest as the sole source of Plan funding and as Plan administrator provides any basis for setting aside the challenged benefit determination. Having reviewed the evidentiary record produced by the parties, the Court finds that it does not. There is simply nothing in this record to suggest that Defendant's decision was motivated or influenced by its financial interest in minimizing Plan payouts, beyond the brute fact that Defendant does indeed have such a financial stake in benefit determinations. To overturn the decision here based solely on the presence of such a financial stake in the outcome would be tantamount to adopting a *per se* rule of reversal in cases involving conflicts of interest. In this Court's view, the case law does not permit such a result. *See, e.g., Peruzzi v. Summa Medical Plan,* 137 F.3d 431, 433 (6th Cir. 1998) (upholding a denial of benefits by an administrative appeal board that included the chief operating officer and two vice presidents of the defendant plan administrator, SummaCare, where there was no "other specific evidence tending to show that SummaCare was motivated by cost"). *Compare Killian v. Healthsource Provident Administrators, Inc.,* 152 F.3d 514, 521 (6th Cir.1998) (citing the defendant's conflict of interest as additional evidence of its arbitrary and capricious denial of benefits, where there were "procedural peculiarities" in the defendant's review of the plaintiff's claim). For all of these reasons, the Court concludes that Defendant's benefit determination survives review under the arbitrary and capricious standard.

## B. Plaintiff's Count II Claim of Lack of Notice

In Count II of his Complaint, Plaintiff alleges that Defendant violated ERISA and the terms of the Plan by failing to provide notice of its deferral of Plaintiff's retirement benefits when Plaintiff reached the normal retirement age of 65 but continued to work. Both parties have moved for summary judgment on this Count, agreeing that there are no disputed issues of material fact, but disagreeing as to the governing law.

### 1. The Standards Governing the Parties' Cross–Motions

The parties both seek summary judgment in their favor pursuant to Fed. R.Civ.P. 56. Under this Rule, summary judgment is proper " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment. According to the *Celotex* Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy of cases, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out

to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

\* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

\* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

\* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989); *see also Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these standards in considering the parties' cross-motions for summary judgment on Count II of the Complaint.

**2. Although Defendant Failed to Provide Proper Notice under the Plan, This Failure Does Not Entitle Plaintiff to the Remedy He Seeks.**

The Plan provides for a "Normal Retirement Age" of 65. (Plaintiff's Motion, Ex. 5, Plan at 12.) Plaintiff attained the age of 65 on June 3, 1996. If Plaintiff had chosen to retire that day, he would have begun receiving monthly retirement benefit payments under the Plan, calculated as of his normal retirement date. (*Id.* at 20.)

Plaintiff, however, did not retire in June of 1996, but continued to work for Defendant for two more years. Accordingly,

under the express terms of the Plan, Plaintiff did not begin to receive benefits until he actually retired in July of 1998, at the age of 67. (*See id.* at 12 (specifying that a retiree's monthly retirement income "shall commence as of the Retired Participant's Retirement Date"); *id.* at 20 (stating that upon late retirement, the retiree's accrued benefit will "commenc[e] on said Participant's Late Retirement Date").) While Plaintiff continued working, his monthly retirement benefit continued to increase, in accordance with part (c) of the post-TRA formula, at a rate of 0.5% of Plaintiff's average monthly earnings for each of his two additional years of service.

It is undisputed that Defendant provided no express written notice in June of 1996 that Plaintiff's retirement benefits would not commence until he actually retired. Plaintiff contends that Defendant was required to do so, under both ERISA and the terms of the Plan. The Plan does indeed call for such notice, in section 4.09:

*4.09 Suspension of Benefits.*

(a) *Working Past Attained Age Sixty–Five.*

   (i) A Participant who remains employed by the Employer after his Normal Retirement Date and who is expected to be credited with at least forty (40) Hours of Service each month will have a Late Retirement Date on the first day of the month coincident with or next following actual termination of employment with the Employer.... **The Administrator shall notify such Participant that Monthly Retirement Income will not commence until his Late Retirement Date and that the Monthly Retirement Income will be equal to that amount determined pursuant to Section 4.03....**

(*Id.* at 25 (emphasis added).) Defendant does not (and cannot) dispute that the Plan

administrator failed to comply with this provision.[26]

Plaintiff's claim of an ERISA violation rests upon § 203(a)(3)(B) of ERISA, which provides:

A right to an accrued benefit derived from employer contributions shall not be treated as forfeitable solely because the plan provides that the payment of benefits is suspended for such period as the employee is employed, subsequent to the commencement of payment of such benefits.

29 U.S.C. § 1053(a)(3)(B); *see also* 26 U.S.C. § 411(a)(3)(B) (incorporating the identical provision as part of the IRC). This provision further states that "[t]he Secretary [of Labor] shall prescribe such regulations as may be necessary to carry out the purposes of this subparagraph." *Id.*

The plain language of this provision makes no mention of notice. Moreover, as Defendant points out, § 203(a)(3)(B) on its face seems inapplicable to the present situation, where payment of Plaintiff's benefits had not "commence[d]" as of his normal retirement date, where payments were not "suspended" on that date, and where Plaintiff's benefits were not "treated as forfeitable," but instead continued to accrue as he continued working and were paid out in full upon his actual retirement.[27]

**26.** Instead, as discussed below, Defendant effectively raises a "constructive notice" defense, and also argues that Plaintiff has identified no harm resulting from any lack of notice.

**27.** The Court does note one difficulty with Defendant's claim that Plaintiff's benefits were never "suspended." Namely, the Plan provision quoted above that addresses continued employment after age 65 is entitled "Suspension of Benefits."

**28.** The "suspendable amount" in this case would appear to be the amount of Plaintiff's monthly benefit that derives from employer contributions. *See id.* § 2530.203–3(d)(1).

Nevertheless, as Defendant concedes, the implementing regulation issued by the Department of Labor ("DOL") calls for notice of withheld pension benefits where the employee continues to work past his normal retirement age. In particular, this regulation establishes a "suspendable amount," above which the employer may not "permanent[ly] withhold[ ]" the payment of accrued pension benefits during periods of "section 203(a)(3)(B) service." 29 C.F.R. § 2530.203–3(b)(1).[28] The regulation then defines "section 202(a)(3)(B) service" as any period of service "subsequent to the time the payment of benefits commenced **or would have commenced if the employee had not remained in** or returned to employment." *Id.* § 2530.203–3(c)(1) (emphasis added).[29]

Taken together, these provisions apparently authorized Defendant to withhold Plaintiff's retirement benefits while he continued to work past age 65. However, the regulation further required notice of this withholding:

(4) Notification. No payment shall be withheld by a plan pursuant to this section unless the plan notifies the employee by personal delivery or first class mail during the first calendar month or payroll period in which the plan withholds payments that his benefits are suspended.

29 C.F.R. § 2530.203–3(b)(4). Again, assuming this regulation applies here, Defen-

This apparently is the entire monthly benefit, as Defendant pays the entire cost of the Plan.

**29.** In notes accompanying this regulation, the DOL acknowledges and confirms the understanding of commentators that "service beyond normal retirement age may be treated as 'section 203(a)(3)(B) service' if relevant requirements are met, even though no formal act of retirement has occurred." 46 Fed.Reg. 8894, 8896 (1981). This commentary indicates that, under this regulation, Plaintiff's period of employment after he reached age 65 constituted "section 203(a)(3)(B) service." *See also Atkins v. Northwest Airlines, Inc.,* 967 F.2d 1197, 1201–02 (8th Cir.1992) (adopting this construction of the DOL regulation).

dant concedes that no such notice was given.

Defendant argues, however, that this regulation should not apply here, because it exceeds the scope of ERISA § 203(a)(3)(B) by reaching situations where benefit payments have not commenced and benefits are not being forfeited or suspended. As Defendant points out, the courts have refused to apply other DOL regulations where they exceed the scope of the enabling statute. *See, e.g., Seaman v. Downtown Partnership of Baltimore, Inc.,* 991 F.Supp. 751, 754 (D.Md. 1998) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)). Defendant urges this Court to perform a similar *Chevron* analysis with respect to the DOL regulation at issue here.

The Court, however, declines to reach this difficult question of the scope of the DOL's authority to issue implementing regulations under ERISA § 203(a)(3)(B). In particular, there is no need to undertake such an analysis here, because the *Plan itself* requires notice of the deferral of benefit payments, even if § 203(a)(3)(B) does not. Having effectively chosen to incorporate the challenged DOL regulation into its own Plan, and having therefore obligated itself to provide notice, Defendant cannot maintain that it is being improperly subjected to a regulatory requirement of notice.

This leaves only the question of the proper remedy for Defendant's notice violation. Plaintiff argues that he is entitled to elect between (i) his monthly benefit as it continued to accrue under the Plan during his two additional years of service, and (ii) the actuarially adjusted value of his monthly benefit computed as of his normal retirement date at age 65.[30] According to Plaintiff's actuarial expert, Joseph Esuchanko, this latter amount is $6,480.97, and therefore exceeds the former amount of $5,169.98 (the amount now being received by Plaintiff). The principal authority cited by Plaintiff in support of this theory of recovery is a decade-old *proposed* Treasury regulation which, so far as the Court can tell, has never been adopted. *See* 53 Fed.Reg. 11876, 11879–86 (1988).[31] More importantly, this proposed regulation nowhere addresses the issue of notice, much less specifying a remedy for any failure to provide notice.[32]

In contrast, Defendant directs the Court to the Sixth Circuit's decision in *Lewandowski v. Occidental Chemical Corp.,* 986 F.2d 1006, 1010 (6th Cir.1993), holding that "ERISA does not remedy procedural violations with a damage award." In that case, the plaintiff alleged that the defendant "failed to comply with ERISA-imposed notice and disclosure obligations in administering" a retirement plan. 986 F.2d at 1007. Upon reviewing ERISA's "civil remedy enforcement scheme" at 29 U.S.C. § 1132, and observing that § 1132(c) au-

---

**30.** As explained in *Atkins, supra,* the concept of "actuarial adjustment" is intended to ensure the full payment of vested retirement benefits to employees who work beyond the normal retirement age. *Atkins,* 967 F.2d at 1201. Statistically speaking, such late-retiring employees will receive benefits for fewer years than co-workers who retire at the normal retirement age. Actuarial adjustment attempts to eliminate this disparity by paying actuarially increased benefits to those who work beyond the normal retirement age.

**31.** Plaintiff also cites a "Pension Distribution Answer Book," but this in turn cites only the DOL regulation quoted above and the proposed Treasury regulation.

**32.** Thus, it is simply false to assert, as Plaintiff does in the brief in support of his motion, that "[t]he regulations clearly and carefully state that if a plan fails to perform the necessary notice requirements to suspend benefits in accordance with 29 C.F.R. § 2530.203–3(b)(4), then the participant is entitled to earn actuarially increased benefits." (Plaintiff's Motion, Br. in Support at 14.) Similarly, in his response to Defendant's motion, Plaintiff mischaracterizes various provisions in § 204 of ERISA, 29 U.S.C. § 1054, as granting the substantive remedy he seeks, when in fact these provisions also do not address deficiencies in notice.

thorizes the imposition of a fixed civil penalty of up to $100 per day for ERISA procedural violations, the Court found "nothing in that subsection, or § 1132 as a whole, [which] suggests that ERISA would approve of an affirmative damage recovery based merely on a plan administrator's failure to adhere to proper notification and disclosure procedures." 986 F.2d at 1008. Moreover, upon surveying the relevant case law, the Sixth Circuit concluded that "[c]ourts considering the issue rightly have refused to create a blanket ground for recovery not provided for in ERISA, either by precluding any damage award or limiting such award to the most egregious of circumstances." 986 F.2d at 1009.

Next, Defendant cites the decision in *Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803, 807 (6th Cir.1996), for the proposition that "substantial compliance" is sufficient to satisfy the requirement under § 503 of ERISA, 29 U.S.C. § 1133, that an administrator must give adequate notice of the denial of a claim for benefits. In *Kent,* the Sixth Circuit conceded that "the procedures utilized in this case were technically deficient," but held that these procedures nonetheless were "sufficient to meet the purposes of Section 1133 in insuring that the claimant understood the reasons for the denial of the claim as well as her rights to review of the decision." 96 F.3d at 807.

Defendant contends that there was substantial compliance with the notice requirement in this case. First, Defendant points to Plaintiff's admission in an affidavit that "I did not expect to start receiving my pension benefits until after I retired." (Defendant's Motion, Ex. F, Monks Affidavit at ¶ 3.) Defendant further notes that Plaintiff asked for a calculation of his benefits in September of 1990, well before his normal retirement date in 1996, and then again in June of 1997, more than a year before he actually retired. Finally, Defendant notes that both the Plan and the

Summary Plan Description provide that Plan benefits will not commence until the participant's actual date of retirement. From all this, Defendant argues that Plaintiff was aware of the deferral of his retirement benefits and of the approximate amount of those benefits, so that any purposes served by the Plan's notice requirement were substantially achieved.

Defendant also argues that the remedy sought by Plaintiff is not necessary to make him whole, but instead would represent a windfall. As Defendant points out, Plaintiff continued to accrue retirement benefits for each additional year of service beyond age 65. Defendant also notes that Plaintiff's monthly salary increased during this period, thereby increasing his pension benefits by virtue of his greater average monthly earnings. Thus, in Defendant's view, Plaintiff's benefits were not "forfeited" when he reached age 65, but actually continued to grow over the next two years.

The Seventh Circuit recently reached this conclusion when confronted with a similar claim of benefit "forfeiture." In *Lunn v. Montgomery Ward & Co.*, 166 F.3d 880 (7th Cir.1999), the plaintiff argued that he was unfairly penalized under his employer's retirement plan for continuing to work four years past the normal retirement age of 65. The pension plan offered by the defendant employer, Wards, included a "defined benefits" component, known as the Retirement Security Plan ("RSP"), which effectively ensured that each retiree would receive an annual benefit equal to 1.5 percent of his total earnings as a Wards employee through his actual retirement date.[33] The plaintiff claimed that the RSP discriminated against late-retiring employees because the continued accrual of benefits under the 1.5–percent formula did not make up for the benefits he would "forfeit," actuarially speaking, as a result of the reduced number of years he could expect to receive benefits upon late retirement.

---

**33.** This description is somewhat simplified, because the pension plan actually integrated payouts under the RSP plan with payouts under a "defined contribution" plan funded by the employee.

After first rejecting the plaintiff's argument as a matter of economics and plan interpretation, the Court next found that it could not be squared with the relevant language of ERISA, including the provision cited by Plaintiff here:

The provision of ERISA on which the plaintiff primarily relies, section 203(a), 29 U.S.C. § 1053(a), provides that "an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age." That provision has no possible application here, because nothing in the plan forfeits retirement benefits when the employee reaches the normal retirement age. Lunn could have retired at age 65 with the normal retirement benefit.

Another provision of ERISA may be relevant: section 204(b)(1)(H)(i), 29 U.S.C. § 1054(b)(1)(H)(i), added to ERISA by the Omnibus Budget Reconciliation Act of 1986, forbids reducing "the rate of an employee's benefit accrual ... because of the attainment of any age." Wards could not say to Lunn, if you insist on working after you reach the age of 65, we're going to cut down your normal retirement benefits. But Wards did not say (or do) that. Lunn remained in the retirement plan(s), accruing benefits in exactly the same way he had been doing before he turned 65, until he retired. He was treated the same as all other workers; there was no forfeiture....

    \*     \*     \*     \*     \*     \*

Lunn's position has an even more radical implication, though he does not draw it: that all defined benefit plans violate section 203(a). The longer a worker works after normal retirement age, the less likely the increase in his benefits as a result of additional years of service is to offset the loss in expected benefits as a result of reduced life expectancy. Suppose that Wards had only the defined benefits plan (RSP) and that Lunn, having worked for Wards for, let us say, 20 years before his sixty-fifth birthday, kept working after that until he was 80,

earning ... $50,000 a year throughout his employment. Then his total earnings past normal retirement age would be $750,000 (15 × $50,000), entitling him to an additional annual benefit of $11,250 (.015 × $750,000) on top of the $15,000 that he would have been entitled to had he retired at 65 (.015 × 20 × $50,000). By delaying his retirement for 15 years, he would have forgone total retirement benefits of $225,000 (15 × $15,000), and this loss might exceed the expected value of the additional $11,250 a year that he would be receiving by retiring at 80. Yet no one supposes, and Lunn does not argue, that defined benefits plans violate ERISA, or any other statute, merely because, depending on the age of the employee and his choice of when to retire, the actuarial value of his retirement benefits may be less than if he had retired at the normal retirement age. Or that to comply with ERISA, a defined benefits plan must begin paying benefits to the employee when he reaches the normal retirement age even if he doesn't retire then.

166 F.3d at 883–84 (citations omitted); *see also Atkins, supra,* 967 F.2d at 1202 (recognizing that continued benefit accruals while an employee continues to work can substitute for the obligation to pay actuarially increased benefits upon late retirement).

■ While *Lunn* does not involve questions of notice, it does address, and emphatically reject, the premise underlying Plaintiff's claim for relief—namely, that he suffered a "forfeiture" of benefits by continuing to work past the normal retirement age of 65. Having considered the relevant law and regulations, and conceding that the statutes and case law do not definitively speak to the precise issue presented here, the Court simply finds no support for the notion of "forfeiture" advanced by Plaintiff. Although it would be problematic if Defendant failed to give proper notice of the deferral of benefits *and* these benefits also ceased to accrue when Plaintiff reached the Plan's normal retirement age, this is not such a case. Rather, to offset

its deferral of benefits, Defendant continued to increase the pension benefits Plaintiff would receive upon his eventual retirement. This continued accrual overcomes any claimed entitlement to the actuarial equivalent of the benefits Plaintiff would have received if he had retired at age 65.

Moreover, the Court is not persuaded that Defendant's failure to provide the proper notice, whether under the Plan or under ERISA and its implementing regulations, actually operated to Plaintiff's detriment. The Plan requires only notice that pension benefits will not commence until the employee actually retires, and it is undisputed that Plaintiff already knew this. The relevant DOL regulation requires that this notice of benefit "suspension" be accompanied by "a description of the specific reasons why benefit payments are being suspended, a general description of the plan provisions relating to the suspension of payments, a copy of such provisions, and a statement to the effect that applicable Department of Labor regulations may be found in § 2530.203–3 of the Code of Federal Regulations." 29 C.F.R. § 2530.203–3(b)(4). It is difficult to see how any of this additional information would have better and more fully advised Plaintiff that he ran the risk of "forfeiting" some of his pension benefits, at least in the actuarial sense, if he continued working past the normal retirement age of 65. Notably, Plaintiff has not claimed that this additional information might have led him to reconsider his decision to work past age 65, nor that this decision was based upon any misapprehensions that might have been corrected had he been given this additional notice.

In sum, the Court simply is unable to identify any apparent harm suffered by Plaintiff as a result of Defendant's failure to give proper notice. Neither has the Court located any authority for awarding the relief sought by Plaintiff. Accordingly, the Court concludes that this case is governed by the principles stated in *Lewandowski* and *Kent,* and that no damage award is warranted by Defendant's procedural violation.

### IV. *CONCLUSION*

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is treated in part as a motion to affirm the benefit determination challenged in Count I of Plaintiff's Complaint, that Defendant's Motion is GRANTED in this respect, and that the challenged benefit determination is AFFIRMED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment is treated in part as a motion to reverse the benefit determination challenged in Count I of the Complaint, and that Plaintiff's Motion is DENIED in this respect.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED with respect to Count II of Plaintiff's Complaint.